**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**NICHOLAS REED MAGEE**                     **CIVIL ACTION**

**VERSUS**                                  **NO. 22-3835**

**FLORIDA MARINE, LLC, ET AL.**             **SECTION: "P" (5)**

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This is a negligence and unseaworthiness action brought by Plaintiff, Nicholas Magee, pursuant to the Jones Act and general maritime law against his employer and vessel owner and operator, Florida Marine, LLC, Florida Marine Transporters, LLC, and PBC Management, LLC. Plaintiff seeks damages for personal injuries he sustained while working on the Ohio River as a deckmate aboard the M/V JOHN PASENTINE II, an inland towing vessel.

This case was tried without a jury from July 29, 2024 to August 2, 2024. The Court has carefully considered the testimony of all the witnesses, the exhibits entered into evidence during the trial, and the record. Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court hereby enters the following findings of fact and conclusions of law.

To the extent that any findings of fact may be construed as a conclusion of law, the Court hereby adopts them as such. To the extent that any conclusions of law constitute a finding of fact, the Court adopts them as such.

## I. FACTUAL BACKGROUND

1.  The plaintiff in this matter is Nicholas Magee, a resident of Pine, Louisiana. At the time of the March 6, 2022 incident giving rise to this litigation, he was employed by the defendants and was working as a member of the crew of the M/V JOHN PASENTINE II. Mr. Magee was 26 years old at the time of the incident.

2.    The defendants in this matter are Florida Marine, LLC, Florida Marine Transporters, LLC, and PBC Management, LLC (collectively referred to herein as "Florida Marine"). Florida Marine, LLC, is a limited liability company organized and existing under the laws of the State of Louisiana and was the operator of the M/V JOHN PASENTINE II at the time of the incident. Florida Marine Transporters, LLC limited liability company organized and existing under the laws of the State of Delaware.  Florida Marine Transporters was originally listed on the M/V JOHN PASENTINE II's COI as the operator of the vessel. PBC Management, LLC is a limited liability company organized and existing under the laws of the State of Florida.  PBC Management, LLC is the staffing affiliate of Florida Marine, LLC. PBC Management is the nominal employer of Mr. Magee.

3.    The M/V JOHN PASENTINE II is a 4000 HP towing vessel, 116 feet in length, bearing Official Number 1314985.[1]

4.    In the days leading up to the incident, the M/V JOHN PASENTINE II (also referred to herein as "the Vessel") was operating on the Ohio River, pushing multiple barges (usually 15 at a time, lashed together into a "tow") up and down the river. The conditions on the Ohio River at that time included extremely high water and a strong current. The route in question required the Vessel to navigate through locks on a routine basis and also to drop and pick up barges.[2]

5.    At the time of Mr. Magee's incident, the M/V JOHN PASENTINE II had aboard it two wheelhouse personnel (the master and pilot), two engineers, and three deckhands. Mr. Magee was stationed aboard the M/V JOHN PASENTINE II serving as a deckmate, which fits within the deckhand category. Other members of the M/V JOHN PASENTINE II's

---

[1] Defense Exhibit 14, "M/V JOHN PASENTINE II Certificate of Inspection. "
[2] Trial Testimony of Nicholas Magee; Trial Testimony of David Spencer; Defense Exhibit 6, "Marine Incident Report."

crew included Captain David Spencer, its master, Curtis "Peewee" Howe, its pilot, engineers Mark Maselli and Charlie Kirkham, and deckhands Willis Rushing and Bryceton Scott.[3]

6.   The majority of the crew on the vessel would work alternating six-hour watches. On each watch, one wheelman, one engineer, and one deckhand would be awake and working.

7.   In the days leading up to the incident, Willis Rushing held the front watch with Captain Spencer, working from 6:00 a.m. to 12:00 p.m. (noon) and 6:00 p.m. to 12:00 a.m. (midnight). At the time of the incident, Mr. Rushing had worked as a deckhand for less than two months. He was considered a "green deckhand" and was not allowed to do any deck work by himself because of his inexperience.[4]

8.   Bryceton Scott stood the back watch with the pilot, Mr. Howe, working from 12:00 p.m. (noon) to 6:00 p.m. and 12:00 a.m. (midnight) to 6:00 a.m. Mr. Scott had less than four months of experience as a deckhand. And like Mr. Rushing, Mr. Scott was also considered a "green deckhand" and was not allowed to do any deck work by himself because of his inexperience.[5]

9.   Mr. Magee was assigned to work the "call watch." Mr. Magee testified that, as he understood his watch assignment, he was required to work from 6:00 a.m. to 6:00 p.m., as well as any other time outside of his watch period when a deckhand was needed, which included when the vessel went through a lock, when the vessel moored, when a tow needed to be built, or any other time a deckhand needed to go out on tow.[6] Because the

---

[3] Defense Exhibit 6, "FMT Marine Incident Report."
[4] Joint Exhibit 1, Deposition Testimony of Willis Rushing.
[5] Joint Exhibit 1, Deposition Testimony of Bryceton Scott.
[6] Trial Testimony of Nicholas Magee.

other two deckhands were green and could not do any deck work by themselves, Mr. Magee claims he was severely overworked prior to the incident.

## THE INCIDENT

10. On March 6, 2022, at 9:35 p.m., the Vessel arrived in Catlettsburg, Kentucky, where it planned to refuel at Mid America Fuels.[7] Before it could tie up at Mid America Fuels, the Vessel first needed to drop off its tow at a nearby fleet. Mr. Magee was off watch as the Vessel was approaching Catlettsburg, so Captain Spencer instructed Mr. Rushing to go wake him. Captain Spencer also instructed Mr. Rushing that he and Mr. Magee needed to remove the trash from the Vessel during their stop at Mid America Fuels.[8]

11. At the Catlettsburg, Kentucky location, Mid-America Fuels operates a fuel flat (also referred to as a fuel barge), a dock where vessels can discard trash, and a "boat store" where crewmembers can purchase various personal items or cigarettes. The dock and boat store are located shoreside. The fuel barge runs parallel to the dock, floating in the river and connected to the dock via mooring lines. When a vessel stops at Mid America Fuels, it moors to the opposite side of the fuel barge from the dock.

12. The Vessel arrived at Mid America Fuels at about 10:05 p.m.[9] Once the fuel lines were hooked up, Mr. Magee and Mr. Rushing began unloading the trash from the Vessel.[10]

13. The only way to get from the Vessel to Mid America's dock (where the dumpsters were located) was to walk across the fuel barge and then to step from the fuel barge to the dock, specifically the stairway of the dock.[11]

---

[7] Plaintiff's Exhibit 8, "Vessel Logs."
[8] Joint Exhibit 1, Deposition Testimony of Willis Rushing.
[9] Plaintiff's Exhibit 1, "AIS Playback."
[10] Joint Exhibit 1, Deposition Testimony of Willis Rushing.
[11] Trial Testimony of Nicholas Magee; Plaintiff's Exhibit 2, "Vessel CCTV Camera 19."

14. There is generally a gap of about 8 to 12 inches between the fuel barge and dock.[12] On the night of the incident, however, the gap between the fuel barge and the dock was wider than usual. [13]

15. To carry out the trash removal task, Mr. Rushing was moving the trash bags from the Vessel to the fuel barge, and then Mr. Magee was taking the trash bags from the fuel barge, across the gap to the dock, and then up to the dumpsters.[14]

16. Mr. Magee had successfully crossed the gap between the fuel barge and dock three to four times prior to the incident. On what Mr. Magee described as his fourth or fifth trip removing trash, he fell between the fuel barge and dock, into the Ohio River.[15]

17. Video footage of the incident was captured by one of the cameras on the M/V JOHN PASENTINE II.[16]

18. The very brief portion of the video that was saved shows Captain Spencer standing at the edge of the fuel barge, where one would cross from the fuel barge to the stairway on the dock. Next, it shows Mr. Magee walking across the fuel barge with a trash bag in each hand. When Mr. Magee reaches the edge of the fuel barge, he stands next to Captain Spencer for approximately 10 seconds. Mr. Magee then begins to step across the gap with his left leg. As he places his left leg onto the stairway of the dock, Mr. Magee loses his balance and falls backwards into the Ohio River, in between the fuel barge and dock. Captain Spencer then leans down from the fuel barge and assists Mr. Magee out of the water and onto the landing area at the base of the dock's stairway. Mr. Magee stays seated

---

[12] Trial Testimony of Nicholas Magee; Trial Testimony of David Spencer.
[13] Trial Testimony of Nicholas Magee; Trial Testimony of David Spencer.
[14] Joint Exhibit 1, Deposition Testimony of Willis Rushing; Trial Testimony of Nicholas Magee.
[15] Trial Testimony of Nicholas Magee.
[16] Plaintiff's Exhibit 2, "Vessel CCTV Camera 19."

on the landing area for approximately one minute before stepping back across the gap, onto the fuel barge, and walking back to the Vessel. The video cuts off just as Captain Spencer begins to cross the gap.[17]

19.  After returning to the Vessel, Mr. Magee took a shower. When he got out of the shower, he realized his right knee was swollen. He told Captain Spencer about his knee, and Captain Spencer reported it to the Senior Port Captain, who sent someone to take Mr. Magee off the boat and to the hospital.[18]

20.  The configuration of the fuel barge, the dock, and the dock's stairway are shown in the photograph below.



In this photograph, which was extracted from the video footage admitted into evidence, Mr. Magee is crossing the fuel barge with trash in hand, and Captain Spencer is standing at the edge of the fuel barge near the dock's stairway.

---

[17]  Plaintiff's Exhibit 2, "Vessel CCTV Camera 19."
[18] Trial Testimony of Nicholas Magee.

**CONDITIONS AT THE TIME OF THE INCIDENT**

21.   Mr. Magee was required to remove trash from the Vessel at nighttime while it was raining.[19]

22.   Mr. Magee testified that the gap was between one and a half to two feet wide.[20] The video footage of the incident shows Mr. Magee falling backwards and somewhat to the side, through the gap.[21] Thus, the gap had to be at least as wide as Mr. Magee is from shoulder to shoulder. Captain Spencer testified that he noticed the fuel barge was gapped out "pretty wide."[22]

23.   Mr. Howe, the Vessel's pilot, testified that he knew the fuel barge at Mid America Fuels had a tendency to gap out further from the dock when a vessel moored to the fuel barge, and he also knew that it was possible to close the gap by maneuvering the Vessel a certain way because he had done so on more than one occasion during prior stops at this facility. Mr. Howe testified that he did not close the gap on the night of the incident because no one asked him to. He relieved Captain Spencer from the wheelhouse after the Vessel was already moored alongside the fuel barge.[23]

24.   In addition to the wide gap Mr. Magee had to cross from the fuel barge to the fuel flat, the Court finds by a preponderance of the evidence that the vertical distance between the fuel barge and the landing area at the base of the stairway was too far for Mr. Magee to safely step from the fuel barge to the landing area, forcing Mr. Magee to step across onto a narrower space, i.e., one of the steps of the stairway.

---

[19] Defense Exhibit 6, "FMT Marine Incident Report."
[20] Trial Testimony of Nicholas Magee.
[21] Plaintiff's Exhibit 2, "Vessel CCTV Camera 19 zoomed."
[22] Trial Testimony of David Spencer.
[23] Trial Testimony of Curtis Howe.

a. At trial, Mr. Magee testified that he could not have stepped from the fuel barge to the base of the stairs because the base of the stairs was about three to four feet below the fuel barge.[24] Thus, given the wider-than-normal horizontal gap he was navigating, he could not also step down three to four feet.

b. Florida Marine's experts testified that the fuel barge was only three inches above the stairway's landing area. To reach this conclusion, one of the experts relied on measurements taken during an inspection of the dock, which revealed that the handrail located at the base of the stairway was fixed to the wall approximately 38 inches above the ground. Then, by looking at a video taken from the upper deck of the Vessel, the expert determined the handrail was in line with Captain Spencer's waist. With this information, the expert opined that the handrail would have been approximately 35 inches above the base of the fuel barge, which would make the stairway's landing area approximately 3 inches below the base of the fuel barge.[25] The Court finds this opinion to be unreliable. To reach this conclusion, the experts used camera footage from the upper deck of the Vessel to determine the relative positioning of the handrail to Captain Spencer. But this camera angle inaccurately depicts the reality of where the handrail (or any part of the dock) was in comparison to the fuel barge and the people standing on it. The photo below reveals how the positioning of objects relative one another changes depending on the angle from which you view the objects:[26]

---

[24] Trial Testimony of Nicholas Magee.
[25] Trial Testimony of Robert Borison; Trial Testimony of Michael Kuzel.
[26] Plaintiff's Exhibit 62, "Side by Side Perspectives."

8



Thus, the Court is not persuaded by the expert testimony that Mr. Magee could have used the handrail and stepped down onto the base of the stairway instead of onto the narrow stair.

c.  In addition to Mr. Magee's testimony, the Court's finding is further supported by the fact that Captain Spencer himself did not cross by stepping onto the base of the stairway. Captain Spencer testified that there was no handrail that was accessible to him, and, instead, he leaned over the gap and placed his hand on the stairs and then stepped across.[27] The video of the incident cuts off just as Captain Spencer begins to move his leg across. The video does show Captain Spencer placing his hands on the stairway as he described in his testimony, and as the video cuts off it appears as if he is placing his foot on the third step from the bottom, which is the same step Mr. Magee attempted to cross to when he fell into the river.[28]

---

[27] Trial Testimony of David Spencer.
[28] Plaintiff's Exhibit 2, "Vessel CCTV Camera 19 zoomed."

d. Additionally, the video footage also shows the moment Mr. Magee steps back across the gap after the incident. Notably, Mr. Magee had just been sitting on the ground at the base of the stairway. When he moves to the standing position, he does not step directly across from the landing area. Instead, he walks up the first step of the stairway, and then crosses to the fuel barge, where Captain Spencer and another crewmember are waiting to help him across. And based on Mr. Magee's body movement, it appears that even as he is crossing to the fuel barge from the first step, he is having to step upwards a bit to reach the fuel barge. The fact that Mr. Magee did not step across from the landing area and that the crew is waiting to help him across in the space where he would cross over from one of the steps on the stairway also lead the Court to find that, more likely than not, the vertical distance between the fuel barge and the stairway's landing area was too far to safely step from one to another while also trying to navigate the horizontal gap.

**MR. MAGEE'S CLAIM THAT HE WAS OVERWORKED**

25. Mr. Magee claims that he was overworked in violation of federal law and company policy.

26. Under 46 C.F.R. § 140.205(b), "[t]owing vessels with a Towing Safety Management System (TSMS) must be operated in accordance with the TSMS applicable to the vessel."

27. Florida Marine's TSMS, specifically *SMS-07-13 Watch Standing and Rest Period Management*, provides that "crewmembers on a towing vessel are permitted to work no more than 15 hours in any 24-hour period or more than 42 hours in any 72-hour period."[29]

28. Mr. Magee testified that the hours he worked in the days leading up to the accident are reflected in the 96-Hour Work/Rest History Worksheet that he filled out after this litigation

---

[29] Defense Exhibit 94, "SMS 07-13."

ensued, at the request of one of his expert witnesses, Dr. Charles Czeisler. Mr. Magee testified that, despite the lapse in time between when the accident occurred and when he filled out the worksheet, he was able to accurately fill out the form by referring to the Vessel Logs for the days in question, which reflect what the Vessel was doing each day and at what times. Magee testified he was able to determine, based on what the Vessel was doing, whether he would have been working and for how long. Mr. Magee also marked himself as working from 6:00 a.m. to 6:00 p.m. each day, regardless of what the Vessel was doing, because, according to him, this was his set watch period, and he would have been required to be working even if there was no need for him to go out on tow. According to Mr. Magee, he was required to work 18 hours on March 4, 22 hours on March 5, and 16.5 hours on March 6.[30]

29.  The testimony of the other two deckhands, Mr. Rushing and Mr. Scott, supports Mr. Magee's claim that he was overworked. Mr. Rushing testified that he observed Mr. Magee having to work in excess of 15 hours. He testified that Mr. Magee "would stay up just about all night and part of the day working, doing whatever they asked him to do," and that this was due, at least in part, to the fact that the only other deckhands on the Vessel were green.[31] Mr. Rushing also testified that Mr. Magee's shift as the man on call watch included working from 6:00 a.m. to 6:00 p.m.[32] And Mr. Scott, who worked the back watch on the days leading up to the incident, also testified that he observed Mr. Magee working in excess of 15 hours a day in the days leading up to the incident.[33] He testified that anytime he was up

---

[30] Trial Testimony of Nicholas Magee; Plaintiff's Exhibit 101.
[31] Joint Exhibit 1, Deposition Testimony of Willis Rushing.
[32] Joint Exhibit 1, Deposition Testimony of Willis Rushing.
[33] Joint Exhibit 1, Deposition Testimony of Bryceton Scott.

working, Mr. Magee was also up because of the work that needed to be done.[34] Mr. Scott further testified that even when he not on watch, he was not sleeping the entire time and would sometimes stay in the wheelhouse for a bit, and he would observe Mr. Magee up and working during those times as well.[35]

30. At trial, Captain Spencer, Curtis Howe, and Mark Maselli all testified that Mr. Magee was not working as much as he claims based on their opinion about the amount of deck work that was required for the type of run they were on and the fact that Mr. Magee was working the call watch, which in their opinion meant he was only working when needed and not also on a set watch from 6:00 a.m. to 6:00 p.m. But each of these witnesses also testified they could not say for a fact that Magee was not working the hours he claims because they were not awake or on watch for all of those time periods and because they were not specifically tracking Magee's working hours.

31. Florida Marine also elicited testimony regarding what the term "call watch" means from some of their experts with experience in the marine industry, all of whom testified that, generally, a deckhand working call watch does not have a set watch schedule but instead works as needed, when the vessel is doing something that requires additional deck crew, such as going through locks or building or breaking tow.

32. It was the responsibility of the Vessel Master and the other Wheelman to ensure that a Watch Change Checklist was completed every watch.[36] The Watch Change Checklist was Florida Marine's method for logging the working hours of crewmembers.[37] No Watch

---

[34]Joint Exhibit 1, Deposition Testimony of Bryceton Scott.
[35] Joint Exhibit 1, Deposition Testimony of Bryceton Scott.
[36] Plaintiff Exhibit 32-19, "SMS 07-09."
[37] Joint Exhibit 1, Deposition Testimony of Chad Hidalgo; Joint Exhibit 1, Deposition Testimony of Timmy Callais.

Change Checklist was completed at any time on March 4, 5, or 6 on the M/V JOHN PASENTINE II.[38]

33.  The last Watch Change Checklist to be completed prior to Mr. Magee's incident was done on March 3 by Captain Clayton Hunt, before Captain Spencer took over as Vessel Master.[39] According to this document, on March 3, 2022, when Captain Hunt was Vessel Master, Mr. Magee went on watch at 5:00 a.m. and went off watch at 5:00 p.m.[40] Captain Spencer testified that he never ordered Magee to work a 12-hour standing watch period, but he also testified that when he boarded the Vessel and took over as Vessel Master, he did not change Captain Hunt's orders. This March 3rd document thus corroborates Mr. Magee's testimony that, as he understood his watch assignment on March 4, 5, and 6, it included a 12-hour standing watch from 6:00 a.m. to 6:00 p.m. (or 5:00 a.m. to 5:00 p.m., depending on the time zone).

34.  Florida Marine's corporate representative, Timmy Callais, testified that it is Florida Marine policy to pay overtime to any crewmember who works over 12 hours in a day.[41] Florida Marine payroll documents show that in the pay period from March 14 to March 27, 2022, i.e., the pay period following Mr. Magee's incident, the deckhand working call watch on the M/V JOHN PASENTINE II worked overtime multiple days during that pay period.[42] For example, on March 15, 2022, the records reflect the deckhand worked a total of four hours over the 12 hours for which he would receive regular pay. His overtime hours included a two-hour period from 3:00 a.m. to 5:00 a.m. and another two-hour period from

---

[38] Trial Testimony of David Spencer.
[39] Plaintiff Exhibit 17.
[40]  At trial, the 6-hour watch periods were sometimes referenced as 5 o'clock to 11 o'clock, and other times were referenced as 6 o'clock to 12 o'clock. This was explained away as a time zone difference and not as an actual change in working hours.
[41] Trial Testimony of Timmy Callais.
[42] Plaintiff Exhibit 52-3–5.

9:30 p.m. to 11:30 p.m. On March 16, 2022, this deckhand worked a total of two hours over the 12 hours for which he would receive regular pay. The record states he worked overtime from 10:00 p.m. to approximately 12:00 a.m. And on March 17, 2022, this deckhand worked a total of four hours over the 12 hours for which he would receive regular pay. His overtime hours are for a four-hour time period from 7:00 p.m. to 11:00 p.m. In other words, this deckhand was paid for 16 hours worked on March 15, 14 hours worked on March 16, and 16 hours worked on March 17. This record further corroborates Mr. Magee's testimony that the deckhand on call watch worked a 12-hour standing watch period from 6:00 a.m. to 6:00 p.m. (or 5:00 a.m. to 5:00 p.m., depending on the time zone), in addition to other time he was needed in service of the Vessel outside of that watch period, as each of the hours for which this other deckhand was paid overtime falls outside of the same 12-hour standing watch period Mr. Magee claims he was required to work on call watch.[43]

35. Accordingly, the Court finds by a preponderance of the evidence that Mr. Magee's work schedule included a 12-hour watch from 6:00 a.m. to 6:00 p.m., plus anytime deck work needed to be done outside of his watch window, and that, as a result, Mr. Magee was

---

[43] Because Mr. Magee did not receive overtime pay, Florida Marine asks this Court to infer that he did not work in excess of 12 hours on March 4, 5, or 6. The Court does not find this to be a reasonable inference to draw. Mr. Callais testified that to receive overtime pay a deckhand would generally have to request the Captain to submit the overtime request on the deckhand's behalf at the end of the pay period. The Court has no reason to believe Captain Spencer would have submitted a request for overtime pay on Mr. Magee's behalf without Mr. Magee requesting Captain Spencer to do so because Captain Spencer was not tracking Magee's working hours, and he had no record reflecting the number of hours Mr. Magee worked. Thus, the only way Mr. Magee would have received overtime pay is if he had asked Captain Spencer to submit the request on his behalf. But Mr. Magee was taken off the Vessel and to the emergency room shortly after the incident occurred. And due to his injuries, he never returned to the Vessel. That Mr. Magee did not reach out to Captain Spencer to request overtime pay when he was no longer on the Vessel, and was instead receiving medical treatment for the injuries he had recently sustained, does not lead the Court to the inference that Mr. Magee must not have worked in excess of 12 hours a day.

14

worked in excess of 15 hours a day on March 4, 5, and 6, and also worked in excess of 42 hours in the 72-hour period before the incident.

### MR. MAGEE'S CLAIM THAT THE FUEL BARGE MOVED

36. Mr. Magee claims that the fuel barge moved as he was stepping across the gap, causing him to fall.

37. The parties presented competing expert testimony on the issue of whether the fuel barge moved.

38. Plaintiff's expert, Captain Steven Cunningham, who was tendered as an expert in marine electronics, AIS data, and marine accident investigation, testified that it was his opinion that the fuel barge was not securely alongside the dock and was in motion during Mr. Magee's incident. Captain Cunningham reviewed the CCTV footage from the cameras that were fixed to the M/V JOHN PASENTINE II's upper and lower deck and that showed the Mid America Fuels fuel barge and dock. He drew reference points on certain parts of the fuel barge and dock that would not move when the video played. Then, he played the video of the incident, and because you could see that the reference points stayed put but the parts of the fuel barge and dock over which the reference points were drawn were no longer in the same location as the reference points, he opined that this meant the fuel barge was in motion during Mr. Magee's incident.[44]

39. Florida Marine's expert, Michael Kuzel, who was tendered as an expert in event reconstruction, human factors, and biomechanics, performed a similar analysis but determined that the fuel barge did not move at the time Mr. Magee was stepping from the fuel barge to the dock. Mr. Kuzel explained that his conclusion is different because he

---

[44] Trial Testimony of Steven Cunningham.

considered the fact that the video footage comes from cameras that are fixed to the M/V JOHN PASENTINE II, which is in and of itself susceptible to movement. And Mr. Kuzel was able to determine that when there was movement depicted in the video, it was because the M/V JOHN PASENTINE II was moving, not the fuel barge. He did so by placing reference points on the fuel barge and on objects on the dock, such as the windows of a building. The dock is spudded into the ground. Thus, the objects on the dock are permanent fixed objects that would not move as a result of something like a passing vessel's current. Thus, Mr. Kuzel explained that when the video plays, and one sees that the objects on the dock are no longer in line with the reference points that were drawn over them, the only explanation is that the M/V JOHN PASENTINE II (the object with the camera attached to it) moved. The dock that is spudded into the ground did not move. Next, he was able to determine that the fuel barge did not move because the video shows the reference points on the dock and the fuel barge moving the same way relative one another. In other words, because it is known that the dock did not move, the fact that the video depicts the fuel barge's reference points shifting in a manner that is nearly identical to the shift of the dock's reference points means the fuel barge also did not move. Mr. Kuzel further opined that if the fuel barge did move, it was "very, very slightly." And he stated that from a human factors standpoint, there is no evidence of any movement of the fuel barge that could have disrupted Mr. Magee's balance and caused him to fall.[45]

40. Comparing the methodologies of the two experts, the Court finds Mr. Kuzel's testimony on this issue to be more persuasive. The Court is particularly persuaded by Mr. Kuzel's testimony that was given in conjunction with the display of Plaintiff's Exhibit 2A-0037 to

---

[45] Trial Testimony of Michael Kuzel; Plaintiff's Exhibit 2A-0037–0083.

0083, which depicts the incident with Mr. Kuzel's reference points from the moment Mr. Magee begins to step across the gap until he begins to fall.

41. The Court acknowledges that the medical records from Mr. Magee's visit to the emergency room immediately after the incident note that Mr. Magee indicated to medical personnel that the barge's movement caused him to fall.[46] The Court also acknowledges that one of the other deckhands, Mr. Scott, testified that after the incident Captain Spencer told the crew that the barge moving is what caused Mr. Magee to fall.[47] The Court further acknowledges Captain Spencer's testimony that after Mr. Magee was out of the water but while he was sitting on the platform of the dock, he warned Mr. Magee to move out of the way because he was concerned the fuel barge was going to move in and crush his legs,[48] which tends to corroborate Mr. Magee's theory that the fuel barge was in motion.

42. The Court finds it is more likely than not that there were occasional movements of the fuel barge over course of the one minute and 43 seconds of this incident that was captured on camera.

43. Nevertheless, the Court also finds it more likely than not that the fuel barge did not move as Mr. Magee was stepping from the fuel barge to the dock and, thus, that Mr. Magee's fall was not caused by any barge movement.

44. Because the Court finds that barge movement was not a contributing factor to Mr. Magee's fall, the Court need not determine whether any barge movement was caused by the M/V TRISTATE.

---

[46] Plaintiff's Exhibit 5, "Kings Daughters Medical ED Note."
[47] Joint Exhibit 1, Deposition Testimony of Bryceton Scott.
[48] Trial Testimony of David Spencer.

**EXPERT TESTIMONY REGARDING THE CAUSE OF THE INCIDENT**

45. Mr. Magee retained Dr. Charles Czeisler, Steven Cunningham, and Captain Michael Berry to support his claims of negligence and unseaworthiness against Florida Maine.

46. Dr. Charles Czeisler was tendered as an expert in the areas of circadian and sleep science, sleep disorders, fatigue risk management, and the impact of sleep deficiency on human performance. Dr. Czeisler testified that based upon the hours Mr. Magee had been working as reflected in the 96-Hour Work/Rest History Worksheet, Mr. Magee would have been suffering from chronic sleep deficiency at the time of the incident. Dr. Czeisler further testified that chronic sleep deficiency interferes with judgment, postural stability, ability to maintain sway control, and it lengthens reaction time. It is Dr. Czeisler's opinion that these impairments degraded Mr. Magee's perception and situational awareness and caused him to lose his balance and fall into the gap between the barge and dock.[49]

47. Captain Steven Cunningham, Mr. Magee's expert in marine electronics, AIS data, and marine accident investigation, offered opinions in support Mr. Magee's claim that the fuel barge was in motion during the incident. For the reasons stated above, this Court has determined that it is more likely than not that the fuel barge was not in motion as Mr. Magee was stepping from the fuel barge to the dock. Captain Cunningham's second opinion offered in this case is that the fuel barge moved due to the passing of the M/V TRISTATE.[50] This issue of fact is now moot given the Court's express factual finding that the fuel barge did not move as Mr. Magee was stepping from the fuel barge to the dock.

48. Captain Michael Berry was tendered as an expert in the areas of towboat navigation, safety, and operations. Captain Berry provided three opinions at trial. The first two opinions he

---

[49] Trial Testimony of Dr. Charles Czeisler.
[50] Trial Testimony of Captain Steven Cunningham.

offered are now moot.[51] Captain Berry's third opinion, however, is not moot. Captain Berry opined that Captain Spencer and Pilot Howe were not competent to serve as vessel master or wheelman based on their lack of knowledge of Florida Marine's TSMS and their respective duties and responsibilities set forth in the TSMS.[52]

49. Florida Marine retained Robert Borison, Captain Bruce Darst, and Michael Kuzel.

50. Robert Borison was tendered as an expert in the areas of marine safety and safety that involves transfers between docks and vessels. Mr. Borison opined that Mr. Magee should have stepped to the landing area at the base of the stairways rather than the narrow step on the stairway. He further opined that, based on what he observed in a photo of the dock's stairway, the stairs were covered with diamond plate and a type of paint that resulted in a slippery condition, particularly if the surface was wet. He also testified that Mr. Magee was in charge of his own safety responsibility and should have used stop work authority rather than crossing the gap. In essence, Mr. Borison opines that there are unsafe conditions present at the Mid-America Fuels, but that Mid-America Fuels is responsible for its unsafe conditions, and Mr. Magee is responsible for not following safety protocols that could have prevented the accident.[53]

51. Captain Bruce Darst was tendered as an expert in the areas of inland towing, safety, and operation. He testified that if Mr. Magee had complied with Florida Marine's safety policies, then the accident would have been prevented.[54]

---

[51] Captain Berry's first opined that Mr. Magee was overworked. The Court was able to reach this conclusion on its own without an expert and thus did not reference Captain Berry's opinion in explaining the Court's finding. Next, Captain Berry opined that the fuel barge moved. Captain Berry's testimony on this point was cumulative of Captain Cunningham's and not persuasive considering the more reliable methodology applied by Mr. Kuzel. Thus, the Court did not reference his opinion in explaining the Court's finding on this issue either.
[52] Trial Testimony of Captain Michael Berry.
[53] Trial Testimony of Robert Borison.
[54] Trial Testimony of Captain Bruce Darst.

52.   As stated above, Michael Kuzel was tendered as an expert in the areas of event reconstruction, human factors, and biomechanics. In addition to his opinion that the fuel barge did not move, Mr. Kuzel opined that from a human factors and ergonomics perspective, Mr. Magee fell because he attempted to step up onto the third step of the dock's stairway, which required a significant overextension of his body and transfer of weight onto the set of steps Mr. Magee described as being slippery. According to Mr. Kuzel, the video of the incident shows that as Mr. Magee attempted to shift the transfer of weight up and over onto his left leg, the step did not provide sufficient surface friction to resist the application of force by his shoe, and his shoe began to slip. Mr. Magee's balance was perturbed by the slip, and he tried to readjust by quickly bringing his right leg up, but there was nowhere for his right leg to go, so Mr. Magee fell into the water. Mr. Kuzel further opined that from a biomechanics and human factors perspective, he sees no evidence that fatigue was a factor in causing Mr. Magee's fall. Mr. Kuzel agreed with Dr. Czeisler's description of the effects fatigue can have on a person, including that a person with chronic sleep deficiency will typically show signs of impairment such as balance-related performance issues. But Mr. Kuzel testified that there is nothing in the video of the incident that demonstrates that Mr. Magee was experiencing balance-related issues.[55]

53.   Based on all of the documentary evidence and the testimony presented at trial, the Court finds by a preponderance of the evidence that Mr. Magee slipped and fell into the Ohio River because the method of work was unsafe given the distance between the fuel barge and dock, the wet stairs, and the inability to step from the fuel barge to the landing area at the base of the stairway. The record does not show that Mr. Magee was exhibiting any signs

---

[55] Trial Testimony of Michael Kuzel.

of chronic sleep deficiency. Thus, the Court cannot find that it is more likely than not that any impairments due to sleep deficiency contributed to Mr. Magee's fall.

### MR. MAGEE'S MEDICAL TREATMENT AND INJURIES

54. At 3:32 a.m. on March 7, 2022, Mr. Magee was admitted to the Kings Daughters Emergency Room in Kentucky after the incident.[56] Magee was then flown home to see an orthopedist, Dr. Paul van Deventer. On March 10, 2022, Dr. van Deventer evaluated Magee and was concerned he had a torn meniscus. He ordered an MRI and placed Mr. Magee in a knee brace for stabilization. On March 14, 2022, Dr. van Deventer reviewed the MRI, and it was the impression of both the radiologist and Dr. van Deventer that the MRI showed an acute tear of the medial meniscus in the right knee. Dr. van Deventer determined Mr. Magee would need arthroscopic surgery to address the longitudinal oblique tear peripheral, posterior horn medial meniscus.[57]

55. On March 23, 2022, Magee underwent the arthroscopic surgery with Dr. van Deventer. During the procedure, Dr. van Deventer did not see any meniscal tear, but he did see an impact injury to the cartilage of Mr. Magee's knee, so he performed a plica resection and microfracture repair of a medial femoral condyle defect.[58]

56. On March 29, 2022, Mr. Magee returned to Dr. van Deventer for a follow-up appointment post-surgery. Mr. Magee was complaining of thigh and leg swelling and pain. Dr. van Deventer ordered an ultrasound of Magee's leg, which revealed an occlusive deep vein thrombosis ("DVT") in 1 of 2 peroneal and posterior tibial veins and nonocclusive DVT in

---

[56] Plaintiff's Exhibit 58, "3.7.22 Kings Daughters."
[57] Trial Testimony of Dr. van Deventer; Plaintiff's Exhibit 58, "3.10.22 van Deventer;" Plaintiff's Exhibit 58, "3.14.22 van Deventer."
[58] Trial Testimony of Dr. Paul van Deventer; Plaintiff's Exhibit 58, "3.23.22 Surgery."

the other perineal and posterior tibial veins.[59] Magee reported to the emergency room at St. Tammany Parish Hospital with chest pain, shortness of breath, knee pain, calf pain and occasional color change of toes. Magee's DVT diagnosis was confirmed, and he was prescribed Xarelto (a blood thinner).[60]

57.  On April 4, 2022, Mr. Magee woke up coughing up blood.[61] He had a previously scheduled follow-up appointment with Dr. van Deventer this day. During the visit, Dr. van Deventer aspirated 90 cc of blood from Magee's knee and recommended that Mr. Magee schedule an appointment with a cardiologist or primary care physician about his complaints of shortness of breath.[62] After calling a cardiologist's office to schedule an appoint, Mr. Magee was advised to report to the emergency room immediately.  Mr. Magee was admitted to St. Tammany Parish Hospital and diagnosed with a pulmonary embolism in his right lung.[63]

58.  Mr. Magee remained at St Tammany Parish Hospital until April 7, 2022. The hospital records confirm that his DVT and pulmonary embolism were provoked by the March 23, 2022 arthroscopic surgery. He was discharged with a blood thinner, a heart rate monitor, an oxygen reader, and a prescription for home health.[64]

59.  On April 21, 2022, Mr. Magee presented to Northlake Pulmonary Associates for an outpatient follow-up appointment following his pulmonary embolism. Mr. Magee was cleared for return to work from a pulmonary standpoint once cleared by orthopedist.[65] Mr.

[59] Plaintiff's Exhibit 58, "3.29.22 van Deventer," "3.29.22 Doppler Evaluation."
[60] Plaintiff's Exhibit 58, "3.29.22 STPH."
[61] Trial Testimony of Nicholas Magee.
[62] Plaintiff's Exhibit 58, "4.4.22 van Deventer."
[63] Plaintiff's Exhibit 58, "4.4.22 STPH."
[64] Plaintiff's Exhibit 58, "4.4.22 STPH."
[65] Defense Exhibit 190, "Cressy Medical Record of Nicholas Magee".

Magee was also cleared for physical therapy from a pulmonary standpoint, with activity to be determined by orthopedist.[66]

60. On May 23, 2022, Mr. Magee saw Dr. van Deventer for another follow-up appointment. At this point, Mr. Magee was two months post-arthroscopic surgery. Mr. Magee had been attending physical therapy after being cleared to do so following his pulmonary embolism. Mr. Magee was complaining of ongoing knee pain and had trace joint effusion in his right knee. Dr. van Deventer recommended 4-6 additional weeks of physical therapy with "hopeful release in 6 weeks."[67]

61. On May 25, 2022, Mr. Magee reported to the emergency room at St. Tammany Parish Hospital complaining of right thigh pain and swelling for a few days. The record states he informed the medical providers that he recently had a DVT and pulmonary embolism following a knee surgery and that was concerned he had developed another blood clot. The record notes that Mr. Magee had moderate swelling to the right lower extremity. The record further notes that the duplex ultrasound of his right lower extremity was negative for deep vein thrombosis.[68]

62. On June 20, 2022, Mr. Magee again presented for a follow-up appointment with Dr. van Deventer. Mr. Magee was complaining of "giveaway weakness" in his right leg. Dr van Deventer noted Mr. Magee had been "actively participating in physical therapy." In his assessment/plan, he stated Mr. Magee could participate in light type functional activities. He limited Mr. Magee to carrying a maximum of 20 pounds (10 pounds constantly). And

---

[66] Plaintiff's Exhibit 58, "4.21.22 Northlake Pulmonary."
[67] Trail Testimony of Dr. Paul van Deventer; Plaintiff's Exhibit 58, "5.23.22 van Deventer."
[68] Plaintiff's Exhibit 58, "5.25.22 St. Tammany."

he stated that based on Magee's appearance that day, he believed Magee would reach maximum medical improvement (MMI) in six months with no anticipated impairment.[69]

63. On July 19, 2022, Mr. Magee presented for a follow-up visit with Dr. van Deventer. He complained of fatigue-type issues. Dr. van Deventer elevated Mr. Magee work status to medium duty, which allows him to walk, sit, and stand as tolerated; occasionally life up to 60 pounds; and carry up to 40 pounds.[70] At this time, Dr. Van Deventer's notes indicate he was anticipating MMI in three months, which would have been mid-October 2022.

64. On July 29, 2022, an email from Debbie Bassil (a Florida Marine Nurse Care Manager who attended most doctors' appointments with Mr. Magee)[71] to Janice Tyson (Florida Marine's Claims Manager) states Mr. Magee was not in physical therapy at that time, as Dr. van Deventer was only directing Mr. Magee to do a home exercise program. However, Mr. Magee was reporting that he was still having problems going down steps with full weight bearing and that his knee was still buckling. Ms. Bassil inquired about Ms. Tyson's thoughts on Mr. Magee completing a work conditioning program, and she stated she did not see Mr. Magee being able to get to full unrestricted work release on his own.[72]

65. On August 30, 2022, Mr. Magee presented for a follow-up visit with Dr. van Deventer. He had some swelling in his right knee and was complaining of activity related swelling and discomfort. Dr. van Deventer kept Mr. Magee's work restrictions the same as the July 19, 2022 visit, but he noted that he did not anticipate unrestricted work release until 2023 and that MMI would likely be March 1, 2023.[73]

---

[69] Plaintiff's Exhibit 58, "6.20.22 van Deventer."
[70] Trial Testimony of Dr. Paul van Deventer; Plaintiff's Exhibit 58, "7.19.22 van Deventer."
[71] Trial Testimony of Nicholas Magee; Trial Testimony of Janice Tyson.
[72] Plaintiff's Exhibit 44-93, "July 29, 2022 email from Bassil to Tyson."
[73] Plaintiff's Exhibit 58, "8.30.22 van Deventer."

66.  August 30, 2022 was Mr. Magee's last appointment with Dr. van Deventer. Florida Marine urges the Court to find from these records that Mr. Magee was steadily improving and was on the trajectory to reach MMI by March 2023 and unrestricted work release by January 1, 2023. The Court finds that what these records actually reflect, which was confirmed by Dr. van Deventer's testimony at trial, is that Mr. Magee's functionality was not steadily progressing, nor could Dr. van Deventer accurately predict when Mr. Magee would return to full functionality. Between the months of June, July, and August 2022, Mr. Magee's anticipated MMI date (which included full improvement, with no impairment) changed from December 2022 to October 2022 to March 2023.[74] Moreover, Dr. van Deventer's notes that Mr. Magee was not having any mechanical issues with his knee, that he was responding well to his home therapy program, and that had the ability to do "frequent walking, standing, and stair climbing" are inconsistent with other records describing Mr. Magee's functionality during that period.[75]

67.  On August 31, 2022, for example, Mr. Magee presented for a "Physical Therapy Initial Examination" with Rehab Dynamics. The observation notes from this exam state that Mr. Magee had impaired gait, lacked proper heel/strike/toe off, had shortened stride length, and was apprehensive with weightbearing.[76] At trial, Devon Lockfield, the physical therapist who conducted Mr. Magee's initial examination, testified that in layman's terms, what she observed was that Mr. Magee was in pain when he moved his knee; he was not walking

---

[74] Trial Testimony of Dr. Paul van Deventer; Plaintiff's Exhibit 58, "6.20.22 van Deventer;" Plaintiff's Exhibit 58, "7.19.22 van Deventer;" Plaintiff's Exhibit 58, "8.30.22 van Deventer."
[75] Plaintiff's Exhibit 44-93, "July 29, 2022 email from Bassil to Tyson;" Plaintiff's Exhibit 58-49, "8.31.22 Rehab Dynamics."
[76] Plaintiff's Exhibit 58, "8.31.22 Rehab Dynamics"

very well; his balance was off; and he was not able to functionally move around as far as walking and things like that.[77]

68.  Between August 31, 2022 and September 26, 2022, Mr. Magee attended six physical therapy sessions with Rehab Dynamics. He was consistently reporting pain and swelling following physical therapy sessions and when doing activity at the house. For example, on September 6, 2022, he reported that "he had some pain after last time and some swelling but that is normal for me. I was up and down on the tractor all weekend which hurts my knee, and it was as big as a watermelon the next day." On September 12, 2022, he reported that one of his physical therapy exercises was hurting his knee to the point that he was in pain all weekend and had to sleep in the recliner for 2 or 3 nights. On September 14, 2022, Mr. Magee reported that his knee was feeling the same. On September 26, 2022, Mr. Magee reported activity-related swelling and pain in the knee, making it difficult for him to walk. No physical therapy exercises were performed on this day, and the physical therapist recommended Mr. Magee return to his doctor due to continued pain complaints.[78]

69.  On October 5, 2022, Mr. Magee saw orthopedist Dr. Robert Bostick, III for a second medical opinion. Dr. Bostick's physical examination revealed significant antalgic gait, swelling, significantly altered mechanics when trying to extend the knee, and exquisite tenderness in his medial joint line and anteromedial joint to palpation. Dr. Bostick reported that he suspected Mr. Magee was experiencing a direct knee issue and ordered an MRI of Mr. Magee's right knee to evaluate this issue.[79]

---

[77] Trial Testimony of Devon Lockfield.
[78] Plaintiff's Exhibit 58, "8.31.22 Rehab Dynamics;" Plaintiff's Exhibit 58, "9.6.22 Rehab Dynamics;" Plaintiff's Exhibit 58, "9.8.22 Rehab Dynamics;" Plaintiff's Exhibit 58, "9.12.22 Rehab Dynamics;" Plaintiff's Exhibit 58, "9.14.22 Rehab Dynamics;" Plaintiff's Exhibit 58, "9.26.22 Rehab Dynamics."
[79] Plaintiff's Exhibit 58, "10.5.22 Bostick."

70. On October 17, 2022, Mr. Magee saw Dr. Bostick to review the results of the MRI. The MRI showed retropatellar edema, fluid within the knee, and evidence of a torn meniscus of the posterior horn. Dr. Bostick compared the October 2022 MRI with the March 2022 MRI and noted that the torn meniscus was in the same location in both films. Dr. Bostick stated that Mr. Magee required another arthroscopic surgery but wanted Mr. Magee to undergo a doppler venous ultrasound of his leg to rule out DVT. Dr. Bostick also wanted Mr. Magee to consult with a hematologist to confirm Mr. Magee did not have a protein deficiency or some metabolic issue making him prone to blood clots given Mr. Magee's pulmonary embolism following his previous arthroscopic surgery, and to have an appropriate plan to manage his blood clot risk with respect to the likely upcoming surgery.[80]

71. On October 27, 2022, Magee presented for an orthopedic IME with Florida Marine's selected orthopedist, Dr. Neil Duplantier. Dr. Duplantier placed Magee on sedentary type duty writing, "Based off of my exam with the patient I think it will be difficult for him to lift approximately 60 pounds as described at the most recent office visit with Dr. van Deventer." Dr. Duplantier confirmed Magee was experiencing significant pain. Dr. Duplantier also confirmed that the first March 2022 MRI and second October 2022 MRI were unchanged in terms of the medial meniscus.[81]

72. On November 7, 2022, Magee presented to Dr. Bostick showing no significant improvement since his last visit. Dr. Bostick administered 1 cc of Celestone and 1 cc of lidocaine and scheduled a follow up visit to assess Magee's clinical result. In the meantime, Dr. Bostick encouraged Magee to follow up with a hematologist as planned and stated he

---

[80] Trial Testimony of Dr. Robert Bostick, III; Plaintiff's Exhibit 58, "10.17.22 Bostick."
[81] Plaintiff's Exhibit 58, "10.27.22 Duplantier."

would try to refer Magee to a specialist regarding post-thrombotic syndrome given Magee's ongoing extremity complaints.[82]

73. On November 29, 2022, Magee was evaluated by hematologist, Dr. Kristen Sanfilippo, and radiologist, Dr. Suresh Vedantham. During this visit, Mr. Magee also underwent a doppler ultrasound that showed there was "chronic deep vein thrombosis" in one of Mr. Magee's posterior tibial veins. At trial, Dr. Sanfilippo explained that in March 2022 Mr. Magee was diagnosed with DVT in four of his veins, and the DVT that appeared in this November 29, 2022 ultrasound was a chronic DVT that remained from his prior diagnosis in one of his veins.[83]  During this November 29, 2022 visit, Dr. Vedantham confirmed that Mr. Magee's ongoing symptoms were consistent with post-thrombotic syndrome (PTS) of moderate severity.[84]  Dr. Sanfilippo confirmed Magee's DVT was provoked by his first arthroscopic surgery and recommended that Magee take Lovenox (blood thinner) before his next surgery and then apixaban (blood thinner) after the surgery. She also noted that Mr. Magee should consider doing so for all future surgeries he may need.[85] Doctors Vedantham and Sanfilippo recommended that Magee should take Diosmin to help with blood flow and continue with compression therapy.

74. On December 21, 2022, Mr. Magee met with Dr. Bostick to discuss Magee's medical visits and his clearance to undergo surgery.[86]

75. On January 27, 2023, Mr. Magee underwent his second arthroscopic surgery. Dr. Bostick performed an extensive synovectomy, which he described as removing all of the inflamed

---

[82] Plaintiff's Exhibit 58, "11.7.22 Bostick."
[83] Trial Testimony of Dr. Kristin Sanfilippo.
[84] Plaintiff's Exhibit 58, "11.29.22 Vedantham."
[85] Plaintiff's Exhibit 58, "11.29.22 Sanfilippo."
[86] Plaintiff's Exhibit 58, "12.21.22 Bostick."

tissue that was present around the front of Mr. Magee's knee, and he also found the medial meniscal tear that was shown on the MRI and was able to repair the tear.[87]

76.  On February 6, 2023, Magee met with Dr. Bostick for his first post-surgery follow up. Mr. Magee reported his pain was much improved compared to pre-op and his first surgery.  Mr. Magee also reported the cold therapy machine Dr. Bostick prescribed was helping with pain and swelling.  Dr. Bostick referred Magee to physical therapy with a follow up visit in four weeks.[88]

77.  Between February 27 and March 2, 2023, Magee underwent three physical therapy sessions at Care Physical Therapy. Mr. Magee's assessment showed knee instability, painful knee range of motion, swelling, gait abnormality with decreased stance time on his right leg, and decreased walking tolerance.[89]

78.  On March 6, 2023, Mr. Magee returned to Dr. Bostick for another follow up. Mr. Magee reported that physical therapy was making his pain worse and described it as aggravating his blood clot. Mr. Magee also reported that he was now experiencing pain with any pressure on his calf. In addition, he had occasional popping or clicking in his knee and was still experiencing an increase in swelling with activities. Dr. Bostick ordered that physical therapy be put on hold for the time being. He also advised Mr. Magee to take aspirin as a precaution because Mr. Magee was not on any blood thinners at that time.[90]

79.  On March 13, 2023, Magee presented for an independent medical examination at Florida Marine's request to see hematologist, Dr. Steven Fein.  Dr. Fein confirmed Magee has

---

[87] Trial Testimony of Dr. Robert Bostick, III; Plaintiff's Exhibit 58, "1.27.23 Surgery."
[88] Plaintiff's Exhibit 58, "2.6.23 Bostick."
[89] Plaintiff's Exhibit 58, "2.27.2023 CARE;" Plaintiff's Exhibit 58, "2.28.2023 CARE;" Plaintiff's Exhibit 58, "3.2.2023 CARE."
[90] Trial Testimony of Dr. Robert Bostick, III; Plaintiff's Exhibit 58, "3.6.23 Bostick."

"presumed" post-thrombotic syndrome based on his review of Magee's medical records. Dr. Fein also opined that Magee likely had an underlying clotting tendency. He opinion also states, "There is no way to determine whether the injury and surgery 'caused' the clotting. While it's a common practice to assume that this clot was 'provoked,' it's not confirmable."[91]

80. On March 27, 2023, Mr. Magee met with psychiatrist, Dr. John Macgregor. Based on his evaluation of Mr. Magee, Dr. Macgregor noted that Magee had developed post-traumatic stress disorder (PTSD), major depressive disorder, and somatic symptom disorder with predominant pain, all of which he found were the result of the March 6, 2022 work incident. Dr. Macgregor recommended psychotherapy and psychotropic medications to help Magee with these conditions.[92]

81. On April 17, 2023, Magee met with Dr. Bostick for another post-up visit. Magee presented with sharp stabbing pain in the knee when he walked and was still limping. Magee also reported a sense of instability with standing and walking. Despite these complaints, Mr. Magee also reported that his pain was vastly better compared to preoperatively, and Dr. Bostick noted that Mr. Magee seemed optimistic about his recovery. Mr. Magee informed Dr. Bostick of an upcoming appointment with his vascular specialist. Dr. Bostick recommended that Magee get cleared by his vascular specialist before starting further physical therapy.[93]

82. Between May 15, 2023, and June 18, 2024, Mr. Magee underwent 24 sessions of psychotherapy with Dr. John Macgregor. Magee was prescribed 150 mgs of Trazadone for

---

[91] Plaintiff's Exhibit 58, "3.13.23 Fein."
[92] Plaintiff's Exhibit 58, "3.27.23 Macgregor."
[93] Plaintiff's Exhibit 58, "4.17.23 Bostick."

sleep. Macgregor explained to Magee that his dosage would gradually increase until he achieved six to eight hours of continuous, restful sleep. Magee was prescribed antidepressant/anxiolytic Escitalopram at 10 mgs twice a day. Magee was also prescribed Hydroxyzine 25mgs for anxiety or panic.[94]

83. On July 13 and 14, 2023, Magee was again evaluated by hematologist, Dr. Sanfilippo, and radiologist, Dr. Vedantham.  Dr. Vedantham noted Mr. Magee's right leg symptoms were compatible with post-thrombotic syndrome. Mr. Magee reported that his right thigh pain has improved since his recent knee surgery but that he is experiencing persistent pain in the right calf. Dr. Vedantham recommended that Magee begin wearing a prescription pressure stocking, discontinue Diosmin, and start taking Trental to help with blood flow.[95] Dr. Sanfilippo noted that Magee was continuing the deal with symptoms of from post-thrombotic syndrome. In addition, Dr. Sanfilippo responded to Florida Marine IME hematologist Dr. Fein's opinions that "there is no way to determine whether the injury and surgery 'caused' the clot." Dr. Sanfilippo confirmed based on her medical assessment and expertise, she "would directly associate Mr. Magee's right lower extremity deep vein thrombosis complicated by pulmonary embolism . . . to his right knee surgery and thus work injury."  Further, Dr. Sanfilippo found there "was no evidence" Magee's thrombotic events were chronic at the time of presentation.[96] Dr. Sanfilippo testified regarding the basis of these opinions at trial, and the Court found her opinions to be credible.[97]

---

[94] Plaintiff's Exhibit 58, "3.15.23-8.22.23 Macgregor Sessions;" Plaintiff's Exhibit 58, "9.21.2023-6.18.24 Macgregor Therapy."
[95] Plaintiff's Exhibit 58, "7.13.23 Vedantham."
[96] Plaintiff's Exhibit 58, "7.14.23 Sanfilippo."
[97] Trial Testimony of Dr. Kristen Sanfilippo.

84. On July 24, 2023, Magee visited with Dr. Bostick showing some improvement. Dr. Bostick noted that Magee still had medial sided patellofemoral pain and occasional giving out of his knee, especially when walking on inclined surfaces or uneven ground. Dr. Bostick prescribed Magee with topical anti-inflammatory gel and confirmed Magee's clearance to obtain balance and gait training through physical therapy.[98]

85. On September 20, 2023, Mr. Magee returned for a follow-up visit with Dr. Bostick where it was noted Mr. Magee had marginal improvement with swelling but persistent pain since his visit. Mr. Magee was also reporting episodic pain that shoots up his proximal leg to his patellar region, and intermittent pain and swelling in his knee and leg. It was also noted that Mr. Magee was unable to do daily tasks such as lifting and carrying his son and could not stand or walk for significant distances without his leg swelling and having to take a break. At this point, it was Dr. Bostick's impression that many of Mr. Magee's residual symptoms were related to the post-thrombotic syndrome and not some mechanical issue with the knee. Dr. Bostick did note that there may be a need for future injection treatments to manage Mr. Magee's knee pain, but Dr. Bostick found that Mr. Magee was otherwise at maximum medical improvement (MMI) for his right knee condition. Dr. Bostick reviewed job descriptions for various vessel jobs and reviewed work requirements regarding shipboard functional requirements. Based on his review of these job requirements, his opinion was that Mr. Magee would not be able to return to work, long term, with the requirements for marine-based work activity. He did also opine, however, that Mr. Magee should be able to tolerate sedentary or even light-based work that does not involve prolonged standing or walking without frequent breaks. He further noted that Mr. Magee

---

[98] Plaintiff's Exhibit 58, "7.24.23 Bostick."

should refrain from repetitive bending and stooping activities, and he placed Mr. Magee's lifting restriction at 20 to 25 pounds.[99] At trial, Dr. Bostick explained that he was issuing these work restrictions from an orthopedics perspective and that Mr. Magee's post-thrombotic syndrome specialists could issue more restrictive conditions due to the thrombosis.[100]

86. Mr. Magee followed up with Dr. Bostick every six to eight weeks between November 14, 2023 and April 30, 2024. Mr. Magee was still experiencing pain and swelling throughout this period. In January 2024, Mr. Magee received a viscosupplementation injection and a knee brace. In February 2024, Mr. Magee reported that the viscosupplementation injection did provide some relief, but the relief only lasted a few weeks. Mr. Magee was not able to tolerate the knee brace due to his thrombotic issues. In April 2024, Mr. Magee was again complaining of intermittent flare-ups and recurrent swelling. Magee noted that he could not stand or walk more than 30 minutes after which point he had to rest due to increased pain and swelling. Magee noted that Celebrex helped some and was also interested in receiving another injection of the right knee. Dr. Bostick's examination revealed swelling, good range of motion, slight popping from the retropatellar region and patellofemoral region with range of motion. Based on this, Dr. Bostick decided to inject Magee's knee with Celestone/lidocaine.[101]

87. On May 24, 2024, Mr. Magee had an appointment with his hematologist, Dr. Sanfilippo, for continued treatment of his post-thrombotic syndrome. Dr. Sanfilippo noted Mr. Magee's chronic pain and mobility issues. She recommended the following: continue compression

---

[99] Plaintiff's Exhibit 58, "9.20.23 Bostick."
[100] Trial Testimony of Dr. Robert Bostick, III.
[101] Plaintiff's Exhibit 58, "11.14.23 Bostick;" Plaintiff's Exhibit 58, "1.4.24 Bostick;" Plaintiff's Exhibit 58, "2.29.24 Bostick;" Plaintiff's Exhibit 58, "4.30.24."

during waking hours; elevation of right lower extremity throughout the day for at least 20 to 30 minute consecutive intervals, 3 to 4 times a day, to relieve some of the swelling; refrain from bending, squatting, or kneeling activities, refrain from long distance ambulation without breaks (e.g., do not walk longer than 10 minutes without opportunity to stop and elevate); and continue long-term follow up with interventional radiology.[102]

88. On July 23, 2024, Mr. Magee returned for a follow-up appointment with Dr. Bostick. Mr. Magee reported three to four weeks of good relief following the Celestone/lidocaine injection. Mr. Magee was still having difficulty with prolonged standing and walking on firm surfaces. He was wearing compression socks for the continued swelling in his leg. Dr. Bostick testified that he wanted to minimize ongoing cortisone injections to prevent cartilage deterioration, so he and Mr. Magee discussed alternative treatment options like future viscosupplementation injections or platelet-rich plasma injections.[103]

89. Dr. Susan Kahn, who was tendered as an expert in venous thrombosis and post-thrombotic syndrome, testified at trial regarding Mr. Magee's injuries, diagnoses, and treatment. Dr. Kahn opined that all of Mr. Magee's medical records since the time that he was diagnosed with the DVT and pulmonary embolism in March/April 2022 point to the fact that he has remained with symptoms and sequelae that are reflective of post-thrombotic syndrome. She further opined that Mr. Magee's DVT was surgically provoked; that Mr. Magee's pulmonary embolism was a result of the DVT; and that Mr. Magee has severe post-thrombotic syndrome.[104] Dr. Kahn further testified that she does not believe Mr. Magee is capable of satisfying the Coast Guard functional requirements for marine-based work.

[102] Plaintiff's Exhibit 58, "5.24.24 Sanfillipo."
[103] Trial Testimony of Dr. Robert Bostick, III.
[104] Trial Testimony of Dr. Susan Kahn.

34

Additionally, Dr. Kahn described the difficulties Mr. Magee had been experiencing while driving, which were making his PTS symptoms worse. She also noted that long-haul travel can increase a person's risk of developing another DVT. As a result, she advised that he should refrain from routinely commuting for long periods (around 30-60 minutes) to avoid aggravating his PTS symptoms and decrease his risk of developing another DVT.

90. Based on all of the documentary evidence and the testimony presented at trial, the Court finds that Mr. Magee's March 6, 2022 work incident caused all of his injuries and necessitated all of his subsequent treatment. It is undisputed that the first arthroscopic procedure was necessitated by the work incident. Dr. Sanfilippo and Dr. Kahn both credibly testified that Mr. Magee's deep vein thrombosis and subsequent pulmonary embolism were surgically provoked by the initial arthroscopic procedure and that Mr. Magee's post-thrombotic syndrome is a chronic, long-term complication of the surgically provoked DVT. In addition, the Court credits the testimony of Dr. Bostick, who opined that it is more probable than not that the meniscal tear shown on the October 2022 MRI is the same as the one shown on the March 2022 MRI and, thus, that the meniscal tear is related to the March 6, 2022 work incident. The Court likewise finds that through the trial testimony of Dr. Macgregor, Mr. Magee established it is more probable than not that he suffers from PTSD, major depressive disorder, and somatic symptom disorder with predominant pain as a result of the March 6, 2022 work incident.

## II. LIABILITY

### JONES ACT NEGLIGENCE

91. Under the Jones Act, a seaman's employer is liable for damages if the employer's negligence caused the seaman's injury.[105] An employer under the Jones Act has a duty to act with reasonable care under the circumstances.[106] An employer breaches that duty, and is thereby negligent, if it fails to act with reasonable care, *i.e.*, fails to do what a reasonable and prudent employer would have done under the circumstances of the situation.[107] A plaintiff seeking to recover for Jones Act negligence must also prove causation, but the standard of proof is not a demanding one.[108] Indeed, if the employer's negligence "played any part, even the slightest, in producing the seaman's injury," then the employer is liable under the Jones Act.[109]

92. A Jones Act employer has an absolute and non-delegable duty to provide its seaman employees a reasonably safe place to work.[110] This duty to provide seamen employees a reasonably safe place to work includes a duty to provide a reasonably safe means of ingress and egress from the Vessel.[111] It also includes a duty to inspect third-party property for hazards and to take precautions to protect employees from possible defects.[112] The employer must have notice and the opportunity to correct an unsafe condition before

---

[105] *Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331, 335 (5th Cir. 1997).

[106] *Id.* at 338 (5th Cir. 1997) (explaining that employers and employees under the Jones Act are each held to the same standard of care, described as "ordinary prudence under the circumstances," which has been used interchangeably with "due care under the circumstances" and "reasonable care under the circumstances").

[107] *Id.*

[108] *Gowdy v. Marine Spill Response Corp.*, 925 F.3d 200, 205 (5th Cir. 2019) (quoting *Johnson v. Cenac Towing, Inc.*, 544 F.3d 296, 302 (5th Cir. 2008)) ("The standard of causation in Jones Act cases is not demanding.").

[109] *Gowdy*, 925 F.3d at 205; *Brister v. A.W.I., Inc.*, 946 F.2d 350, 354–55 (citing *Chisholm v. Sabine Towing & Transp. Co., Inc.*, 679 F.2d 60, 62 (5th Cir. 1982)) ("[T]he Jones Act contains a liberal causation requirement. If the defendant's negligence played any part, however small, in producing the seaman's injury, it results in liability.").

[110] *Sanford v. Caswell*, 200 F.2d 830, 832 (5th Cir. 1953).

[111] *Massey v. Williams-McWilliams, Inc.*, 414 F.2d 675, 679 (5th Cir. 1969).

[112] *Davis v. Hill Engineering, Inc.*, 549 F.2d 314, 329 (5th Cir. 1977).

liability will attach.[113] "The standard of care is not 'what the employer subjectively knew, but rather what it objectively knew or should have known.'"[114]

93.  The Court concludes Florida Marine failed to provide Mr. Magee with a safe place to work. Mr. Magee was instructed to throw away trash during the stop at Mid America Fuels. The only path from the Vessel to the dumpsters involved traversing the approximately 18-inch gap between the fuel barge and the dock, then stepping onto one of the steps on the stairway (each of which had a 9" run), with no access to a handrail, while it was raining on and off, and the stairs were wet and slippery. Captain Spencer is seen on video standing at the edge of the fuel barge where the hazardous conditions existed. Thus, he knew or should have known of these unsafe conditions. The Court also finds, for the reasons stated below, that Captain Spencer (and thus Florida Marine) had an opportunity to correct the unsafe condition prior to the incident but failed to do so.

a.  The video also shows Captain Spencer and Mr. Magee standing by each other for about 10 seconds before Mr. Magee attempted to step across the gap and fell into the river. It is undisputed that the two men had a conversation during this brief period. What was said during that conversation, however, is in dispute.

b.  According to Mr. Magee, when he approached the edge of the fuel barge, Captain Spencer was standing there and asked Mr. Magee where he was crossing at because Captain Spencer needed to cross to get cigarettes from the boat store.[115]

c.  Captain Spencer testified that when Mr. Magee approached him, he was standing there looking at the gap between the barge and the dock, and he told Mr. Magee the

---

[113] *Colburn v. Bunge Towing, Inc.*, 883 F.2d 372, 374 (5th Cir. 1989).
[114] *Id.*
[115] Trial Testimony of Nicholas Magee.

gap looked pretty wide, to which Mr. Magee responded "yeah." Captain Spencer testified that he then told Mr. Magee that Mr. Magee and Mr. Rushing should get the trash off the boat, bring it over to the edge of the fuel barge, and then hand it across to each other to take it up to the dumpster instead of stepping across the gap. According to Captain Spencer, Mr. Magee said "yeah" to this statement as well but then he took the step across and that's when he fell in.[116]

d.  The Court does not find Captain Spencer's testimony to be credible on this issue. The record in this case is replete with examples of Captain Spencer's lack of knowledge regarding Florida Marine's safety and risk-management policies. This general lack of knowledge alone was enough for the Court to doubt that Captain Spencer instructed Mr. Magee to do his task in a different, safer manner. The Court finds it even more improbable that Captain Spencer instructed Mr. Magee to change the method in which he was moving the trash over the gap given that Captain Spencer specifically testified he was not sure if Florida Marine had any policies about stepping over water and that he did not consider that gap to be "open water."[117] And lastly, the Court notes the testimony of Bryceton Scott, who was off watch when Mr. Magee was injured, but was woken up after the fact and was required to unload the few remaining bags of trash from the Vessel while the Vessel was still moored at Mid America Fuels. Mr. Scott testified that he was taking the trash bags to the dumpster, with a bag in each hand, over the gap Mr. Magee had just fallen through, and that he was stepping on to the same third step because he

---

[116] Trial Testimony of Captain David Spencer.
[117] Trial Testimony of Captain David Spencer.

could not step down to the landing area or access the handrail.[118] The Court finds it highly implausible that Mr. Scott would have been permitted take the trash out using the same method Mr. Magee had used if Captain Spencer had truly warned Mr. Magee to complete the task a different way earlier that evening, given that Mr. Magee's purported disobedience had landed Mr. Magee in the Ohio River.

e.   In sum, the Court credits Mr. Magee's testimony that during the brief conversation with Captain Spencer at the edge of the fuel barge, Captain Spencer was inquiring about how Mr. Magee was getting across the gap because Captain Spencer was about to go across to the boat store; Captain Spencer was not instructing Mr. Magee on how to do the job more safely.

94.   Because the Court found that there was no barge movement during the time period that Mr. Magee was crossing from the fuel barge to the dock, Mr. Magee cannot prevail on his theory of Jones Act negligence for failure to maintain an adequate lookout and to warn Mr. Magee in advance of the TRISTATE's passing because there is no causal connection between Florida Marine's alleged failures in this regard and Mr. Magee's fall and subsequent injuries.

95.   Because the Court determined that it cannot find that it is more likely than not that any impairments due to sleep deficiency contributed to Mr. Magee's fall, Mr. Magee cannot prevail on his theory of Jones Act negligence for overworking Mr. Magee because there is no causal connection between Mr. Magee's excessive work hours and Mr. Magee's fall and subsequent injuries.

---

[118] Joint Exhibit 1, Deposition Testimony of Bryceton Scott.

96. Similarly, Mr. Magee's claims of negligence *per se* against Florida Marine based on violations of federal safety statutes and regulations that have to do with tracking Mr. Magee's working hours cannot prevail because the Court determined that it cannot find that it is more likely than not that any impairments due to sleep deficiency contributed to Mr. Magee's fall. Thus, Mr. Magee is unable to establish a causal connection between the purported violations and his injuries as required to prevail on a negligence *per se* claim.[119]

97. The only negligence *per se* claim that remains is based on Captain Spencer's alleged failure to complete a Job Safety Analysis ("JSA") before sending Mr. Magee to unload trash, in violation of Florida Marine's TSMS.

   a. The Court need not decide whether the failure to adhere to a safety policy set forth in a vessel's TSMS constitutes a violation of 46 C.F.R. § 140.205 such that the TSMS violation is essentially converted into a violation of a federal regulation for purposes of asserting a negligence *per se* claim, because even if a negligence *per se claim* can be based on a TSMS violation, Mr. Magee has failed to prove that Captain Spencer violated Florida Marine's TSMS when he failed to complete a JSA prior to sending Mr. Magee and Mr. Rushing to take out the trash.

   b. Mr. Magee relies on the testimony of Florida Marine's Corporate Representative, Chad Hidalgo, to support his claim, but Mr. Hidalgo merely testified that if a JSA had been completed, it could have prevented the incident.[120] Importantly, though, trash removal is not one of the listed jobs for which a JSA is required under Florida Marine's TSMS.[121] Thus, regardless of whether performing and completing a JSA

---

[119] *See Smith v. Trans-World Drilling Co.*, 772 F.2d 157, 160–61 (5th Cir. 1985).
[120] Joint Exhibit 1, Deposition Testimony of Chad Hidalgo.
[121] Defense Exhibit 90, "SMS-05-05."

for the trash removal task *could have* prevented Mr. Magee's injuries if it had been performed prior to sending Mr. Magee out to do the job, the TSMS did not require Captain Spencer to perform the JSA for this specific task prior to sending Mr. Magee and Mr. Rushing out to begin the task.

c.   Mr. Magee also tried to point to the TSMS's more general requirement that JSAs are required for "jobs with a higher potential for injury."[122] Mr. Magee relies on Mr. Hidalgo's testimony identifying the hazards that were present at Mid America Fuels on the night of the incident in an effort to support his claim that the trash removal task was a job with a higher potential for injury and thus that a JSA should have been performed.[123] But Mr. Magee has not shown that those hazards were known to Captain Spencer before he sent Mr. Magee and Mr. Rushing out to remove the trash. And this theory—that Captain Spencer should have completed a JSA because of the hazards that were present—contradicts the above theory that a JSA should have been completed to discover the hazards that were present before sending Mr. Magee and Mr. Rushing out to remove the trash.

d.   In summary, trash removal generally is not a job for which a JSA is required under Florida Marine's TSMS, and the hazards that would have prompted the need to perform a JSA were not known to Captain Spencer at the time he sent Mr. Magee and Mr. Rushing out to remove the trash from the Vessel at Mid America Fuels. Thus, Captain Spencer did not violate Florida Marine's TSMS by failing to perform a JSA prior to sending Mr. Magee out to perform the trash removal task on the night

---

[122] Defense Exhibit 90, "SMS-05-05."
[123] Joint Exhibit 1, Deposition Testimony of Chad Hidalgo.

41

of the incident. Accordingly, Mr. Magee's negligence *per se* claim based on this theory also fails.

## UNSEAWORTHINESS

98. Given the Court's finding that Florida Marine's failure to provide a safe place to work constituted negligence under the Jones Act, the Court need not address the question of unseaworthiness.[124]

## APPORTIONMENT OF FAULT

99. Under the Jones Act and the law of unseaworthiness, a seaman's contributory negligence diminishes his recovery in proportion to his fault.[125] "To establish that a seaman is contributorily negligent, an employer must prove negligence and causation."[126] Like an employer, "[a] seaman is negligent in he fails to act with ordinary prudence under the circumstances."[127] "The circumstances of a seaman's employment include not only his reliance on his employer to provide a safe work environment but also his own experience, training, or education. The reasonable person standard, therefore, [in] a Jones Act negligence action becomes one of the reasonable seaman in like circumstances."[128]

100. The Court finds Mr. Magee was contributorily negligent. In light of his extensive experience working aboard boats as a deckhand, Mr. Magee knew or should have known that stepping over open water without using three points of contact could increase the risk of injury. Mr. Magee also knew or should have known that Florida Marine had a "Stop

---

[124] *See, e.g.*, *Luwisch v. Am. Marine Corp.*, 956 F.3d 320, 327 (5th Cir. 2020) ("Although Jones Act negligence and unseaworthiness under general maritime law are two distinct causes of action, they largely provide for the same remedies. Consequently, when we rule for a plaintiff on the issue of unseaworthiness, we ordinarily need not consider the question of Jones Act negligence.") (citation modified).

[125] *Johnson v. Cenac Towing, Inc.*, 544 F.3d 296, 302 (5th Cir. 2008); *Luwisch*, 956 F.3d at 327.

[126] *Johnson*, 544 F.3d at 302.

[127] *Id.*

[128] *Id.*

Work Obligation Policy" through which Mr. Magee could have immediately stopped removing trash and not step over the gap until a safer method could be determined. The Court concludes that Mr. Magee is 35% at fault for his injuries.

## FAILURE TO PAY CURE

101.  Mr. Magee claims that between October 2022 and March 2023 Florida Marine arbitrarily refused to approve cure in this case with respect to Mr. Magee's psychiatric care. Mr. Magee seeks compensatory and punitive damages as a result.

102.  When a seaman becomes ill or injured while in the service of his ship, the shipowner must pay him cure, whether or not the shipowner was at fault or the ship unseaworthy.[129] Shipowners are entitled to investigate the propriety of a seaman's cure claim before making any payments to the seaman.[130] If, after investigating, the shipowner unreasonably rejects the claim, when in fact the seaman is due cure, the owner becomes liable not only for the cure payments, but also for compensatory damages.[131] Where the vessel owner has been unreasonable in refusing to pay and has also been "callous and recalcitrant, arbitrary and capricious, or willful, callous, and persistent," then it may also be liable for punitive damages and attorney's fees.[132]

103.  Dr. Bostick issued a referral order for Mr. Magee to see a psychiatrist on October 18, 2022.[133] This information was provided to Florida Marine shortly thereafter. The record reveals Florida Marine was investigating the propriety of Mr. Magee's request and counsel was exchanging correspondence every day or so up until about October 28, 2022. At that

---

[129] *Morales v. Garijak, Inc.*, 829 F.2d 1355 (5th Cir. 1987).
[130] *See Boudreaux v. Transocean Deepwater, Inc.*, 721 F.3d 723, 728 (5th Cir. 2013).
[131] *Morales*, 829 F.2d at 1355.
[132] *Id.*
[133] Plaintiff's Exhibit 58, "10.18.22 Bostick."

point, based on the record before the Court, it does not appear a final decision had been made, but that Florida Marine was still investigating. The next (and last) correspondence in the record is dated March 20, 2023. It appears Florida Marine was requesting additional support for the psychiatric treatment recommended by Dr. Bostick.[134] The Court also has before it the March 27, 2023 psychiatric treatment evaluation from Dr. Macgregor,[135] who is Mr. Magee's treating psychiatrist, and the April 12, 2023 independent psychiatric evaluation by Dr. John Thompson,[136] requested on behalf of Florida Marine. Both evaluations reveal Mr. Magee was indeed in need of psychiatric medication and treatment, and both doctors opined Mr. Magee's psychiatric needs were related to the March 6, 2022 work incident.

104. At trial, Janice Tyson, Florida Marine's Claims Manager, testified that Florida Marine agreed to pay cure for the psychiatric treatment after receiving the evaluations from both providers. Mr. Magee had his first psychiatric treatment session with Dr. Macgregor on May 15, 2023.

105. Based on the documentary evidence in the record and testimony presented at trial related to this claim, the Court cannot find by a preponderance of the evidence that Florida Marine's actions were unreasonable, much less "callous and recalcitrant, arbitrary and capricious, or willful, callous, and persistent." Though it took five months before Mr. Magee was evaluated by Dr. Macgregor after being referred by Dr. Bostick, there is very little evidence in the record showing what was transpiring during that time period. From what the Court can see, Florida Marine was hesitant to approve the cure request based on

---

[134] Plaintiff's Exhibit 42, "Failure to Provide Cure Correspondence."
[135] Plaintiff's Exhibit 58, "3.27.23 Macgregor."
[136] Plaintiff's Exhibit 58, "4.12.23 Macgregor."

a lack of medical documentation supporting a need for it or its relatedness to the March 6, 2022 work incident. Though Florida Marine did not immediately provide payment information like Mr. Magee's counsel requested, there is no express refusal by Florida Marine in the record. Rather, it appears Florida Marine was conducting an investigation and then eventually approved the request for cure. The Court does not find compensatory or punitive damages to be owed on this record.

## III. DAMAGES

106. Under the Jones Act, an injured seaman is entitled to monetary recovery for past, present, and future loss of earning capacity and wages, medical expenses, and pain and suffering caused by his employer's negligence.[137]

### LOST EARNINGS

107. Mr. Magee retained Nancy Favaloro as his vocational rehabilitation expert. She provided two main opinions in this case.

108. First, with respect to current and future job options for Mr. Magee, she testified that, given Mr. Magee's vocational profile, his work restriction to sedentary or light-based work, and the restriction on routinely commuting more than 30 minutes, it is her opinion that compatible job alternatives for Mr. Magee include roles such as a remote call center representative or an at-home customer service representative. Both jobs have a median hourly wage of $14.30. Ms. Favaloro explained that because Mr. Magee lives in a rural area in Louisiana, she was unable to find any sedentary or light-based jobs that were less than a 30 to 40 minute commute from his home. She was able to find these two remote jobs that provide virtual on-the-job training, however.[138]

---

[137] *Nichols v. Weeks Marine, Inc.*, 513 F. Supp. 2d 627, 637 (E.D. La. 2007).
[138] Trial Testimony of Nancy Favaloro.

109. Second, with respect to Mr. Magee's vocational outlook prior to the accident, Ms. Favaloro testified that, given Mr. Magee's background, the licenses he already possessed, and his father and grandfather's work as captains, it is her opinion that it is reasonable and likely the Mr. Magee would have become a captain. She testified that records show he would have been able to submit for his pilot's license in August 2022, which, according to Florida Marine records, would have had him earning $694/day or $166,560/year given 240 workdays a year in this industry. And after one year, he would have been able to start work as a relief captain with earnings of $709/day or $170,160/year given 240 workdays a year. And then eventually when he became a captain, according to Florida Marine records, he would have been earning $733/day or $175,440/year given 240 workdays.[139]

110. Florida Marine retained Stanford McNabb, who provided expert testimony from a vocational rehabilitation perspective and as a life care planner.

111. Mr. McNabb presented two alternative scenarios based on what the trier of fact could find in this case. Scenario One applies if the trier of fact finds that the work incident resulted in sedentary to light duty work restrictions. Scenario Two applies if the trier of fact finds no work restrictions. As has already been determined, the Court credits the opinions of Mr. Magee's current treating physicians who associate his present symptoms with the work incident and who opine that Mr. Magee is restricted to sedentary or light duty work. Thus, the Court considers only Scenario One. The testimony at trial revealed that the jobs Mr. McNabb identified as alternative occupations for Mr. Magee are not realistic, as they would all require Mr. Magee to commute more than 30 to 60 minutes a day, some requiring over five hours of commuting time.[140]. Moreover, based upon the Court's objective

---

[139] Trial Testimony of Nancy Favaloro; Plaintiff's Exhibit 12, "Crew Pay Scale Wheelhouse."
[140] Trial Testimony of Stanford McNabb.

consideration of all evidence and testimony in this case, the Court finds that Mr. McNabb's opinions do not present a reliable application of his vocational rehabilitation expertise to the facts of this case. Rather, the Court finds the vocational analysis of Ms. Favaloro to be more plausible and realistic, and, therefore, a more reliable application of vocational rehabilitation expertise to the facts of this case. That being the case, the Court credits the testimony of Ms. Favaloro, and the Court shall not consider Mr. McNabb's opinions for purposes of determining lost earnings.

112. Mr. Magee retained Ralph Litolff, II as his expert economist. Mr. Litolff calculated Mr. Magee's past and future lost wages and past and future lost fringe benefits as a result of the March 6, 2022 accident, relying on the information and opinions set forth in Ms. Favaloro's report and other documents related to that report.

113. The Court finds Mr. Litolff has properly calculated each of the individual damages categories (past lost wages, future lost wages, past lost fringe benefits, and future lost fringe benefits) as required under the law.

114. Mr. Litolff presents three alternative scenarios for determining past and future lost wages based on Ms. Favaloro's opinions about Mr. Magee's potential career progression from deckmate, to pilot, to relief captain, to captain.

    a. [Scenario 1: Deckmate to Pilot] – Calculations under this scenario assume Mr. Magee would be a deckmate from March 2022 through December 2022, and then a pilot from January 2023 through his work-life expectancy.

    b. [Scenario 2: Deckmate to Pilot to Relief Captain] – Calculations under this scenario assume everything in Scenario 1, except that Mr. Magee would become a relief

captain in January 2024 and remain in that position through his work-life expectancy.

c. [Scenario 3: Deckmate to Pilot to Relief Captain to Captain] – Calculations under this scenario assume everything in Scenario 2, except that Mr. Magee would become a captain in January 2029 and remain in that position through his work-life expectancy.

115. The relevant testimony and documentary evidence in this case all indicate Mr. Magee was a hard worker, well-liked and respected by his employer Florida Marine, and was diligently working towards his goal of obtaining a position in the wheelhouse prior to this incident. Mr. Magee already possessed his 100 Ton license and his 200 Ton Pilot's license. Because Mr. Magee was under 30 years old at the time of the accident, Dr. Favaloro explained that his family history is also a relevant consideration in determining what his vocational outlook would have been had the accident not occurred. Mr. Magee's father and grandfather were both captains in the marine industry. At trial, Mr. Timmy Callais, Florida Marine's Vice President of Vessel Operations and Dry Cargo Operations, testified that Mr. Magee would have been in the wheelhouse by October 2022 had the accident not occurred. Mr. Callais also testified in his deposition that Mr. Magee was the type of person Florida Marine wanted in the wheelhouse. Considering the weight of this evidence, and the lack of any contradictory evidence, the Court finds, more likely than not, Mr. Magee would have become a captain if he had not been permanently injured as a result of the March 6, 2022 incident. The Court further finds, more likely than not, Mr. Magee would have become a captain within the conservative timeline set forth in Scenario 3 of Mr. Litolff's report.

48

116. The Court therefore finds that the calculations for past and future lost wages under Scenario 3 of Mr. Litolff's report apply here, and that, as a result, Mr. Magee is entitled to **$261,261.00** in past lost wages and **$2,731,813.00** in future lost wages.[141]

117. The Court further finds Mr. Magee is entitled to lost fringe benefits in the form of lost medical insurance benefits and lost future maintenance benefits. Mr. Magee is entitled to **$21,323.00** in past lost medical insurance benefits and **$225,693.00** in lost future maintenance benefits.[142]

## FUTURE MEDICAL EXPENSES

118. Mr. Magee retained Dr. Aaron Wolfson to conduct a life care plan assessment to determine Mr. Magee's future medical care needs related to the injuries he sustained as a result of the March 6, 2022 work incident. Dr. Wolfson consulted with Drs. Bostick, Kahn, and Macgregor to gather their medical recommendations regarding the care Mr. Magee will need for the remainder of his life expectancy. During Dr. Wolfson's testimony, the cost tables contained in his report were displayed, and he described the recommendations from each of the doctors. The Court finds the doctors to be credible and that their recommended medical treatment is more likely than not necessary and related to the March 6, 2022 work incident.

119. Mr. Litolff calculated the present value (as of the trial date) of the total future medical costs set forth in Dr. Wolfson's report, which had a low point and high point. The present value of the low point is $61,534.00, and the present value of the high point is $167,426.00, with the midpoint being $110,794.00.

---

[141] Plaintiff's Exhibit 61, "Ralph Litolff Spreadsheet."
[142] Plaintiff's Exhibit 61, "Ralph Litolff Spreadsheet."

120. Accordingly, the Court finds Mr. Magee is entitled to **$110,794.00** in future medical expenses.

## PAIN AND SUFFERING

121. The "amount awarded for pain and suffering depends to a great extent on the trial court's observation of the plaintiff and its subjective determination of the amount needed to achieve full compensation."[143]

122. Here, the Court finds Mr. Magee has experienced significant pain and suffering as a result of the March 6, 2022 work incident. The medical records, Mr. Magee's testimony, and the testimony of his doctors all confirm the physical pain Mr. Magee has experienced and will experience for the remainder of his life. Mr. Magee experienced physical pain when he injured his knee. He experienced physical pain from the two surgeries to repair his knee. He experienced physical pain from his deep vein thrombosis and resulting post-thrombotic syndrome. He experienced physical pain from his pulmonary embolism. He will continue to experience physical pain from his mechanically damaged knee for the remainder of his life, and he will continue to experience physical pain from his post-thrombotic syndrome for the remainder of his life. In addition to this ongoing physical pain, the medical records, Mr. Magee's testimony, the testimony of his wife, and the testimony of his psychiatrist confirm the accident has had a significant impact on him emotionally. Mr. Magee is a hard-working person. He has a wife and a son with special needs. Mr. Magee's inability to provide for his family following the accident has had significant impact on him emotionally. Mr. Magee lives in fear of developing another pulmonary embolism given its life-threatening nature. The physical limits he now has because of the accident cause him

---

[143] *Luwisch v. Am. Marine Corp.*, 956 F.3d 320, 331 (5th Cir. 2020).

embarrassment. He has also experienced a loss of enjoyment of life. He can no longer engage in the activities that used to bring him joy, like hunt, or help his grandpa around the farm, or play outside with his young, high-energy son.

123. For these reasons, the Court finds Mr. Magee is entitled to **$750,000.00** for past pain and suffering and **$1,000,000.00** for future pain and suffering.[144]

**PRE-JUDGMENT INTEREST**

124. In admiralty, the Court has the discretion to award pre-judgment interest. There is a strong presumption in favor of awarding pre-judgment interest, and it will usually be denied only in cases in which the plaintiff exercised undue delay in bringing his action.[145] When a Jones Act case is tried to a jury, the Court may not award pre-judgment interest, but when a Jones Act case is tried to the Court, it may award pre-judgment interest.[146] Pre-judgment interest may be awarded only on damages that have actually accrued as of the date of judgment.[147] It is within the discretion of the Court to select an equitable rate of pre-judgment interest.[148] The Court finds that an award of pre-judgment interest is warranted on Plaintiff's past wages, past fringe benefits loss, and past pain and suffering.

## IV.  SUMMARY

On the basis of the foregoing findings of fact and conclusions of law, the Court finds that the plaintiff, Nicholas Reed Magee, has sustained damages due to the negligence of Florida Marine. Accordingly, Mr. Magee is entitled to recover from Florida Marine the following damages:

Past Wage Loss                   $261,261.00

---

[144] *See Rosenthal v. United States*, Civil Action No. 3:03-CV-0822-N, 2005 WL 926964 (N.D. Tex. Apr. 20, 2005).
[145] *United States v. Ocean Bulk Ships, Inc.*, 248 F.3d 331, 344 (5th Cir. 2001).
[146] *McPhillamy v. Brown & Root*, 810 F.2d 529, 532 (5th Cir. 1987); *Bush v. Diamond Offshore Co.*, 46 F. Supp. 2d 515, 523 (E.D. La. 1999).
[147] *Martin v. Walk, Haydel & Assocs., Inc.*, 794 F.2d 209, 212 (5th Cir. 1986).
[148] *Hansen v. Continental Ins. Co.*, 940 F.2d 971, 984 (5th Cir. 1991).

| | |
|---|---|
| Future Wage Loss | $2,731,813.00 |
| Past Fringe Benefit Loss | $21,323.00 |
| Future Fringe Benefit Loss | $225,693.00 |
| Future Medical Expenses | $110,794.00 |
| Past Pain and Suffering | $750,000.00 |
| Future Pain and Suffering | $1,000,000.00 |
| Total Damages | $5,100,844.00 |
| Mr. Magee's Portion of Fault | 35% |

Adjusting for Mr. Magee's contributory negligence, Mr. Magee is entitled to a total award of **$3,315,574.60.** Mr. Magee is entitled to pre-judgment interest on past damages ($671,179.60) at the rate of 3% per annum from the date of judicial demand until satisfied. Further, Mr. Magee is entitled to post-judgment interest on all remaining damages ($2,644,395.00) at the federal judicial rate from the date of judgment until the date paid.

New Orleans Louisiana, this 31st day of March 2026.

_____

**DARREL JAMES PAPILLION**
**UNITED STATES DISTRICT JUDGE**